2026 IL App (1st) 232328-U

Fourth Division
Filed March 31, 2026

No. 1-23-2328

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County |
| | ) | |
| v. | ) | No. 23 CR 6001501 |
| | ) | |
| JERMAINE NOWDEN, | ) | The Honorable Ursula Walowski, |
| Defendant-Appellant. | ) | Judge, presiding. |
| | ) | |

JUSTICE OCASIO delivered the judgment of the court.
Presiding Justice Navarro and Justice Quish concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's conviction for aggravated battery was affirmed where the evidence was sufficient to sustain his convictions and where unpreserved allegations of error did not amount to plain error or establish ineffective assistance of counsel.

¶ 2    Defendant Jermaine Nowden appeals from his conviction for aggravated battery of a senior citizen. See 720 ILCS 5/12-3.05(a)(4) (West 2022). He challenges the sufficiency of the evidence to sustain the jury's findings that the State proved beyond a reasonable doubt that the victim sustained great bodily harm and that he did not act in self-defense. He also raises three claims of unpreserved trial error, arguing both plain error and ineffective assistance of counsel. Finding that the evidence was sufficient and that there was neither plain error nor ineffective assistance of counsel, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The incident at issue in this case involved three people: the defendant-appellant, Jermaine Nowden; his stepfather, Larry Williams, who was acquitted by the jury; and the alleged victim, Floyd Williams. The two Williamses are not related. For the sake of consistency and clarity, we refer to all three men using their first names.

¶ 5      The evidence at trial established that, on the afternoon of December 31, 2022, Jermaine and Larry were taking the 69th Street bus when Floyd, who was 68 years old, boarded, laden with a cart, a shopping bag, a leather pouch of some kind, and a cane. He found the aisle blocked by a pair of legs belonging to Jermaine, who was dozing in his seat. Saying "excuse me," he nudged or pushed Jermaine's leg, and Jermaine sat up to give Floyd room to pass. Jermaine did not take exception to this, but Larry did, accusing Floyd of kicking Jermaine. That sparked an escalating verbal argument that continued as the bus went on its way. Anxious to leave the situation, Floyd decided to get off a few stops early. He disembarked at the Aberdeen Street stop. According to Jermaine's testimony, that was also his usual stop, so he and Larry also got off the bus. Larry followed Floyd out the rear door. Jermaine, who testified he was trying to avoid being involved in the altercation, got off using the front door.

¶ 6      Floyd and Jermaine gave competing accounts of what happened once they were off the bus. Larry did not testify.

¶ 7      According to Floyd, after the three men had disembarked, Jermaine came toward him as if to grab him while Larry started "trying to unfold [a] long knife." In response, Floyd "upped" his own knife—an illegal switchblade concealed in a set of brass knuckles—and held it to Jermaine's chest. Subsequently, Jermaine and Larry both went across the street and started looking for something. By this point, Floyd was in the middle of the street, hoping that Jermaine and Larry would be deterred by the traffic that was flowing around him. They came for him anyway but stayed out of the reach of his knife. Larry threw a brick, but Floyd ducked out of the way. Jermaine hit Floyd in the head four or five times with a tree branch before it broke. During the attack, Floyd dropped his

cane. Larry grabbed the cane and hit Floyd with it until it too broke. Once both men's bludgeons had broken, they dropped them in the street and walked off.

¶ 8    Jermaine testified that, as soon as he got off the bus at the front door, Floyd was already coming at him with a knife. He lunged at Jermaine, who started to panic when he felt—or thought he felt—the knife stab him in the chest. (He later determined that he had not actually been cut.) Jermaine shoved Floyd away and started backing away while Floyd, undeterred, pursued him into the street. Jermaine was unarmed, so he started grabbing for whatever he could on the ground, eventually finding a tree branch laying in some grass near the sidewalk. As Floyd lunged at him with the knife, Jermaine struck him twice with the branch. After the second blow, Floyd stopped trying to lunge at him and started looking unsteady, so Jermaine stopped striking him and walked away with Larry. Jermaine testified at trial that he never saw Floyd fall to the ground, but a detective testified that, during an interview at the police station that night, Jermaine admitted pushing Floyd to the ground twice and seeing him fall to the ground a third time while walking away.

¶ 9    A bystander who witnessed the altercation called the police, who arrived after the fight was over and found Floyd lying in the middle of the street. He pointed out Jermaine and Larry, who were just down the block, and officers quickly stopped them. When Jermaine complained that Floyd was the one with a knife, officers asked Floyd whether he had one on him. He admitted that he did, and they retrieved it from his pocket and inspected it before returning it to him. A responding officer's body-worn camera captured Floyd getting to his feet in the middle of the street, pointing out his assailants, and producing the switchblade. It also showed broken pieces of a tree branch and a cane lying on the ground in the street. The footage was played for the jury at trial. The record indicates that it was played without sound.[1]

---

[1]    The following exchange can be found during codefendant Larry Williams's cross-examination of Officer Vaughan at pages 206 and 207 of the common law record:

¶ 10     After the incident, Floyd was reluctant to go to the hospital because he was carrying so many things with him. Over objection, he testified that he went anyway because "they said [he had] a concussion and [needed] to go to the hospital." At the hospital, he complained of head and hand pain, estimating his pain level as an eight out of ten. The emergency room was crowded, though, and he eventually decided to go home before being seen by a doctor because he was hungry and kept throwing up. That evening, a detective picked him up at his home and brought him back to the scene to look for some of his belongings and then took him back to the hospital because he was still vomiting. This time, Floyd was seen by a doctor. According to his medical records, Floyd reported that he was suffering from a headache, dizziness, pain and swelling to his right eye, and some blurry vision. A CT scan revealed that he had sustained a fracture to his right lamina papyracea, which is a paper-thin bone that forms part of the eye socket. Floyd testified that he was diagnosed with a "slight fracture" near his nose and advised not to blow his nose. He also testified, over objection, that medical personnel told him he had a concussion. No concussion is noted in the records of the visit. He was discharged without a treatment plan beyond following up with his primary physician.

¶ 11     The parties' closing arguments focused on culpability. Jermaine argued that he acted in self-defense, while Larry argued that Jermaine was the one who had battered Floyd, not him. The jury acquitted Larry but rejected Jermaine's self-defense argument and found him guilty of aggravated battery of a senior citizen and aggravated battery on or about the public way (see 720 ILCS

---

"Q. *** Can you tell us quickly how that body-worn camera—how you activate it?

A. You just press it twice and then it turns on, but it's automatically still on. So there's a buffer that happens before.

Q. I'm not asking you tell me any audio that was on it, but it can also capture audio; is that right?

A. Yes, sir.

Q. *We didn't have any audio here today. I understand that. We saw the pictures.* But when you inventory your body-worn camera, it's inventoried as it has been received; is that right?" (Emphasis added.)

5/12-3.05(c) (West 2022)). The court found that the two aggravated battery charges merged, and it sentenced Jermaine to eight years' imprisonment for aggravated battery of a senior citizen, the more serious of the two. See *id.* § 12-3.05(h) (elevating that form of aggravated battery to a Class 2 felony).

¶ 12                                    II.  ANALYSIS

¶ 13                            A.  Sufficiency of the Evidence

¶ 14     Jermaine first challenges the sufficiency of the evidence to sustain his conviction. Accordingly, we must "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). In conducting that inquiry, we do not ask whether we would have found the defendant guilty. *Id.* at 318-19. "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis removed.) *Id.* at 319; see *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004) (noting that Illinois has adopted the *Jackson* test). Viewing the evidence in the light most favorable to the prosecution means that we "must allow all reasonable inferences from the record in favor of the prosecution." *Cunningham*, 212 Ill. 2d at 280. So, while we do not retry the defendant or weigh the evidence ourselves, we do examine the evidence to determine whether a finding of guilt beyond a reasonable doubt would be reasonable. *Id.* at 279. Our review considers "all of the evidence" adduced at trial, not just the evidence favoring the prosecution. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007).

¶ 15     To obtain a conviction for aggravated battery of a senior citizen, the State must prove beyond a reasonable doubt that the defendant (1) committed a battery, other than by discharge of a firearm, and (2) knowingly caused great bodily harm, permanent disability, or disfigurement to somebody who is at least 60 years old. 720 ILCS 5/12-3.05(a)(4) (West 2022). Furthermore, when self-defense is properly raised, as it was here, the State must also prove beyond a reasonable doubt that the defendant did not act in justifiable defense of self. *People v. Lee*, 213 Ill. 2d 218, 224 (2004).

On appeal, Jermaine argues that the evidence was insufficient to prove beyond a reasonable doubt that he caused great bodily harm and that he did not act in self-defense. We address each argument in turn.

¶ 16                                  1.  Great Bodily Harm

¶ 17        Whether an injury amounts to "great bodily harm" is a question of fact for the jury. *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 69. "Although the term *great bodily harm* is not susceptible of a precise legal definition, it requires an injury of a greater and more serious character than an ordinary battery." *People v. Mimes*, 2014 IL App (1st) 082747-B, ¶ 29. In other words, great bodily harm requires something that goes beyond mere "physical pain or damage to the body, like lacerations, bruises or abrasions." *People v. Mays*, 91 Ill. 2d 251, 256 (1982). Relevant to the inquiry is "evidence of what injury the victim actually received, the evidence of the nature and extent of the victim's injury, and evidence of the treatment required." *In re J.A.*, 336 Ill. App. 3d 814, 818 (2003).

¶ 18        Here, the evidence established that Floyd sustained a fractured orbital bone and significant swelling around his right eye. A bone fracture, obviously, is a more serious injury than a cut, scrape, or bruise. The evidence also established that, in the several hours after the altercation, Floyd vomited repeatedly and experienced headaches, dizziness, and blurred vision. Although the medical records do not reflect a diagnosis of a concussion, these symptoms pointed to *some* kind of injury of a greater magnitude than mere bodily harm. The jury also had before it the manner in which the injuries were inflicted: multiple blows to the head with a tree branch, at least one of which was powerful enough to break the branch. "Illinois law recognizes 'that a physical beating may qualify as such conduct that could cause great bodily harm.' " *People v. Kinnerson*, 2020 IL App (4th) 170650, ¶ 73. In its role as trier of fact, a rational jury could have found that this evidence established beyond a reasonable doubt that Floyd suffered great bodily harm.

¶ 19        In arguing that the evidence was insufficient to prove great bodily harm, Jermaine cites *In re Vuk R.*, 2013 IL App (1st) 132506. In that case, the court found the evidence insufficient to prove

great bodily harm even though the victim testified that he sustained a broken nose, a broken cheek bone, and some kind of injury to his eye socket. *Id.* ¶ 9. Jermaine reasons that, because Floyd's injuries were similar, they too must not have been severe enough to amount to great bodily harm. But the inadequacy in *Vuk R.* was not the extent of the claimed injuries but the strength of the evidence presented supporting the victim's claims. The court specifically noted that the only evidence that the victim suffered broken bones came from testimony given by the victim and his father "in summary fashion." *Id.* ¶ 9. The photographs of the injuries showed only swelling and discoloration, and no other evidence shed light on the severity of the victim's injuries. *Id.* Here, unlike in *Vuk R.*, the State put forward more than conclusory testimony from Floyd. It adduced medical evidence confirming that he had sustained a fracture to his right lamina papyracea in addition to his other symptoms. *Cf. People v. Steele*, 2014 IL App (1st) 121452, ¶¶ 34-35 (finding evidence insufficient to prove great bodily harm where the medical records did not support the victim's claim to have suffered torn ligaments during the charged incident).

¶ 20      Jermaine also argues that Floyd's injuries did not amount to great bodily harm because (1) the evidence showed that his pain had vanished by the time he visited the hospital the second time, (2) he did not require stitches or undergo any procedures to repair his fractured orbital bone, and (3) he was discharged with no plan for treatment other than a follow-up visit to his usual doctor. These facts are no doubt relevant to whether Floyd suffered great bodily harm, but only to the extent that they illuminate the nature and extent of his injuries. See *People v. Thigpen*, 2017 IL App (1st) 153151, ¶ 30 ("The question is not what the victim did or did not do to treat his or her injuries but what injuries he or she received."). Given the other evidence of Floyd's injuries, however, they do not make the jury's finding of great bodily harm irrational.

¶ 21      Although a different jury might not have found that Floyd's injuries rose to the level of great bodily harm, we cannot say that no rational trier of fact could have reached that conclusion. The evidence, accordingly, was legally sufficient to prove beyond a reasonable doubt that Floyd sustained great bodily harm.

¶ 22                                    2. Self-Defense

¶ 23       Jermaine next argues that the evidence did not prove beyond a reasonable doubt that he did not act in self-defense. "There are six elements to a claim of self-defense: (1) force was threatened against the defendant, (2) the defendant was not the initial aggressor, (3) the risk of harm was imminent, (4) the threatened force was not lawful, (5) the defendant subjectively believed that the use of force was necessary to avert the danger, and (6) the defendant's belief was objectively reasonable." *People v. Hampton*, 2021 IL App (5th) 170341, ¶ 95. To prove that the defendant did not act in self-defense, the State must negate, beyond a reasonable doubt, at least one of those six elements. *Id.*

¶ 24       The State argues that it carried its burden through Floyd's testimony. A conviction can be sustained on the testimony of a single witness so long as a trier of fact could have rationally found that testimony credible. *People v. Smith*, 185 Ill. 2d 532, 545 (1999). Jermaine argues that Floyd's testimony was not sufficiently credible to disprove self-defense beyond a reasonable doubt. His argument hinges primarily on what happened during the initial period of the confrontation, after the three men got off the bus. He points out that Floyd was the one who pulled out a knife and put it to his chest, and he argues that Floyd's claim that Larry drew his own knife was not credible for a variety of reasons. What Jermaine overlooks is that, at this point during the confrontation, he had not yet committed the battery he was charged with. We can assume, for the sake of analysis, that Floyd put his knife to Jermaine's chest unprovoked because what matters is what happened next.

¶ 25       According to Jermaine, he tried to shove Floyd away and started backpedaling, looking for anything he could use to defend himself, before finding a tree branch and striking Floyd with it twice, allowing Jermaine and Larry to escape. According to Floyd, Jermaine and Larry went across the street, found makeshift weapons—a tree branch and a brick, respectively—and returned to where Floyd was in the middle of the street, where Jermaine struck him in the head until the branch broke and Larry, after throwing the brick but missing, picked up Floyd's cane and hit him with it until it too broke. In deciding which of these accounts to credit, if either, the jury could have reasonably noted that Floyd's account was consistent with the fact that, when the police arrived,

they found Floyd in the middle of street surrounded by pieces of a tree branch and his broken cane. Consequently, even if we assume that Floyd put a knife to Jermaine's chest as an initial act of aggression, the jury could still have reasonably credited Floyd's account of what happened next.

¶ 26    That matters because, even if Floyd threatened Jermaine, that threat did not give Jermaine *carte blanche* to commit any act of violence he pleased. It justified his use of force only to the extent that it was "necessary to defend himself" from the threat of violence. 720 ILCS 5/7-1 (West 2022). A person faced with a violent assault does not have a duty to retreat before acting in self-defense. *People v. Easter*, 102 Ill. App. 3d 974, 980 (1981). But "a nonaggressor has a duty not to become the aggressor." *People v. De Oca*, 238 Ill. App. 3d 362, 367 (1992). Acts of retaliation and revenge are not self-defense. *Id.* at 368; *accord People v. Holman*, 2014 IL App (3d) 120905, ¶ 59 (citing *People v. Woods*, 81 Ill. 2d 537, 543 (1980)). According to Floyd's account, which the jury could have reasonably credited, Jermaine crossed the street, located an improvised bludgeon in the form of a tree branch, and then came back to where Floyd was. The jury could have rationally found beyond a reasonable doubt that, by the time he struck Floyd with the branch, Jermaine had become the aggressor, negating Jermaine's claim of self-defense. See *People v. Belpedio*, 212 Ill. App. 3d 155, 161 (1991) ("If one responds to a confrontation with such excessive force that one is no longer acting in self-defense but in retaliation, the excessive use of force renders one the protagonist."). The evidence was therefore sufficient to sustain his conviction.

¶ 27    Jermaine also contends that the jury's finding that he was guilty was inconsistent with the jury's acquittal of Larry. The rule recognized in Illinois is that the acquittal of a codefendant does not raise a reasonable doubt as to a convicted defendant's guilt unless the evidence against both defendants is identical. *People v. Vriner*, 74 Ill. 2d 329, 343 (1978); *People v. Wilkerson*, 2016 IL App (1st) 151913, ¶ 74. Here, the evidence against Jermaine was not identical to the evidence against Larry. Most obviously, Jermaine admitted that he hit Floyd with a tree branch; Larry, who did not testify, admitted nothing. The jury could have reasonably found that the stronger evidence against Jermaine proved his guilt beyond a reasonable doubt while the weaker evidence against Larry did not prove his guilt under that high standard of proof. See *People v. Johnson*, 318 Ill. App.

3d 281, 290 (2000) (finding no inconsistency because the evidence against the acquitted codefendant was weaker).

¶ 28                                    B. Unpreserved Trial Errors

¶ 29        Next, Jermaine argues that the trial court erred by (1) allowing hearsay testimony that Floyd sustained a concussion, (2) allowing the prosecution to define the element of great bodily harm incorrectly during closing argument, and (3) allowing Floyd's testimony to be bolstered by the introduction of prior inconsistent statements. As none of these errors were preserved for appellate review, Jermaine invokes the plain-error doctrine, which allows us to review clear and obvious errors despite forfeiture under certain circumstances, one of which is that the trial evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant. *People v. Sebby*, 2017 IL 119445, ¶ 48. Alternatively, Jermaine argues that his attorney's failure to raise or preserve objections to those errors denied him his right to the effective assistance of counsel, which requires him to show that counsel's inaction was objectively unreasonable under prevailing professional norms and prejudicial in the sense that there is a reasonable probability that, had counsel performed competently, he would not have been convicted. See *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Under either theory, Jermaine must show that there was actually some sort of error that occurred. *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 24.

¶ 30                                 1. Floyd's Purported Concussion

¶ 31        Jermaine first contends that the trial court erred by allowing the State to elicit testimony from Floyd that others told him he had sustained a concussion. During his direct examination, he testified over objection that police encouraged him to go to the hospital because they believed he had a concussion:

> "Q. What happened when you initially went to the hospital?
>
> A. Well, I didn't want to go because I had all my stuff and they said you have a concussion and you need to go to the hospital.
>
> [DEFENSE COUNSEL]: Objection. Hearsay, your Honor.

THE COURT: Overruled.

* * *

Q. When you were with the detective [later that night], did they ultimately take you back to the hospital?

A. Yeah, they took me back to the scene to see if they could find the stuff in the street. Then they took me to the hospital.

Q. Why did they take you to the hospital?

A. Because I kept on throwing up.

Q. How long were you throwing up for?

A. I threw up about eight or nine times. They said it could be the concussion."

He also testified over objection that doctors diagnosed him with a concussion:

"Q. And did you learn anything about what happened to your face from the injuries that you sustained?

A. Yeah, they said I had a concussion—

[DEFENSE COUNSEL]: Objection, your Honor.

THE COURT: Overruled.

BY [PROSECUTOR]:

Q. Go ahead.

A. They said I had a concussion and a fracture."

Later, he further testified, without a renewed objection, that an injury to the left side of his head depicted in a photographic exhibit was from the same blow that had caused a concussion.

¶ 32      Jermaine contends that this testimony was inadmissible hearsay and that Floyd, as a lay person, was not competent to testify about any specific medical diagnoses. The State does not dispute that this testimony was clearly and obviously inadmissible hearsay, and we agree with Jermaine that it was.

¶ 33    The question becomes whether the evidence was so closely balanced that Floyd's hearsay testimony that he suffered a concussion threatened to tip the scales of justice against Jermaine. We have already found that the evidence before the jury was legally sufficient to sustain its finding that the State had proven beyond a reasonable doubt that Floyd suffered great bodily harm during the charged incident. Whether the evidence was closely balanced for plain-error purposes, however, is a distinct question. *People v. Piatkowski*, 225 Ill. 2d 551, 556 (2007). When deciding whether the evidence was closely balanced, we "evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *People v. Sebby*, 2017 IL 119445, ¶ 53. The question is whether the error "occurred in a close case where its impact on the result was potentially dispositive." *Id.* ¶ 68.

¶ 34    Our analysis starts with the commonsense observation that the nature of Floyd's injuries was not contested by the defense. There is no question that he sustained a fracture to an orbital bone. That alone was an injury that went beyond mere lacerations, bruises, or abrasions, demonstrating great bodily harm standing alone. See *Mays*, 91 Ill. 2d at 256. But the fracture did not stand alone. Floyd testified that, in the hours following the altercation, he repeatedly vomited and he experienced headache, dizziness, and blurred vision. That testimony went unchallenged and showed that, in addition to the bone fracture, Floyd had sustained some kind of head injury that went beyond a cut, a bruise, or a scrape. See *id.* Floyd's improper testimony that police or medical personnel informed him that he had a concussion did little more than give a label to a cluster of symptoms that were not in dispute. We are unable to say that the evidence as to the nature of Floyd's injuries was so closely balanced that the addition of the label "concussion" risked tipping the scales of justice against him. We therefore do not excuse Jermaine's forfeiture under the plain-error doctrine. For the same reason, we hold that the record does not establish that counsel's failure to preserve this issue for appellate review was prejudicial.

¶ 35      2. State's Discussion of Bodily Harm During Closing Argument

¶ 36  Next, Jermaine contends that, during closing argument, the State provided the jury a legally erroneous definition of great bodily harm. See *People v. Shaw-Sodaro*, 2023 IL App (4th) 220704, ¶ 24 (stating that prosecutors may not misstate the applicable law during closing argument). He points to one sentence in the prosecutor's closing argument.

¶ 37  Closing arguments must be read in their entirety, though, and particular remarks must be considered in context. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). Here is the prosecutor's complete argument on this point:

> "First we look at bodily harm and great bodily harm. That's what we're talking about here. We have great bodily harm for sure. How do we get there to great bodily harm? We have several instrumentalities.
>
> First as you saw from Officer Vaughn's body-worn camera, there was debris in the street. It's not just ordinary debris, we have not just a stick, we have a tree limb for Mr. Floyd Williams was [s]truck about the head. Also in that street on that body-worn camera we have a cane, a cane that is shattered and splintered amongst Mr. Floyd Williams' belongings. These are the weapons used to create the great bodily harm. What kind of great bodily harm are we talking about? We saw him first of all on the body-worn camera and through the pictures that my partner brought on screen when Mr. Floyd Williams testified. You saw he had cuts about his face. He had several injuries to his hands and scrapes. He was throwing up nine times is what he said over the course of several hours based on being struck about the head. He had a concussion. That's just how he felt amongst the pain.
>
> When he got to the doctor he had a broken—his face was broken—part of his face was broken as evidenced through the certified medical records that are coming in. I just want to recap what we're talking about.

> This is the day after the incident. Mr. Floyd Williams being struck about the head with that limb and that cane, he's got a broken face, his eye is swollen, is bulging.
>
> He's got cuts about the head and he has cuts about the hand. That is great bodily harm. Simple bodily harm is just pain. He's got broken bones now."

When the statement that "[s]imple bodily harm is just pain" is read in this context, we do not agree that the prosecutor was clearly misstating the law. As a whole, the State's argument was that there was great bodily harm because Floyd was struck in the head with a tree branch and hit with a cane, causing him not only pain but repeated vomiting, a broken facial bone, and a bulging eye. Within that context, the remark that "[s]imple bodily harm is just pain" was not an attempt to define great bodily harm as being anything beyond mere pain, it was a rhetorical illustration that Floyd's "broken bones" went well beyond mere bodily harm. There was no clear error and, hence, no plain error.

¶ 38    The analysis under ineffective assistance is, for this allegation of error, somewhat different. Although the statement was not itself clearly erroneous, we acknowledge that, had counsel objected, the court would likely have clarified, at minimum, that the jury should follow the law as given by the court, not by the lawyers. But even assuming that the failure to object amounted to deficient performance, Jermaine has not shown prejudice. As illustrated above, the State's theory did not rely on the mere presence of a cut, scrape, or bruise but the fact that Floyd sustained a broken bone and a head injury that prompted repeated instances of vomiting. There is not a reasonable probability that the jury rejected the unchallenged evidence about his significant injuries yet still found that he had suffered great bodily harm. Counsel's failure to object did not deprive Jermaine of his right to effective assistance.

¶ 39　　　　　　　　　　　　3. Floyd's Prior Consistent Statements

¶ 40　　　　Finally, Jermaine challenges the purported admission of prior consistent statements by Floyd. The rule against hearsay generally bars introducing out-of-court statements as evidence when used to prove that whatever the statement asserts is true. Ill. R. Evid. 801 (eff. Oct. 15, 2015); R. 802 (eff. Jan. 1, 2011). Generally, this prohibits introducing evidence that, on some other occasion, a witness said something consistent with that witness's trial testimony. *People v. Doehring*, 2021 IL App (1st) 190420, ¶ 100. Although prior consistent statements may be introduced to rehabilitate a witness's credibility under certain circumstances (see Ill. R. Evid. 613(c) (eff. Sept. 17, 2019)), the State does not dispute that the testimony at issue here was not admissible under that theory.

¶ 41　　　　Jermaine identifies two instances where, he argues, the State introduced statements made by Floyd that were consistent with his trial testimony. First, Officer Vaughn testified that, when Floyd produced his knife to the officers, he said that he had not used it on anybody and only carried it to defend himself. Second, Vaughn's body-worn camera recorded Floyd giving officers a brief account of the incident that was consistent with his trial testimony. For different reasons, we find that neither of these alleged errors amount to plain error or support an ineffective-assistance claim.

¶ 42　　　　The portion of Vaughn's testimony that Jermaine argues was improper came in response to a question about whether Floyd was carrying anything on him. She was not asked whether Floyd said anything about what he might have been carrying; she simply volunteered that he had:

> "Q. Aside from the injuries that you observed on Mr. Floyd Williams, did you have a chance to take an inventory or account of any items that he may have had on his person when he was in your squad car being evaluated?
>
> [COUNSEL FOR JERMAINE]: Objection. Relevance.
>
> THE COURT: Overruled.
>
> THE WITNESS: All of the items that were on his person at the time. So when we saw these two gentlemen, they said that there was something on his person and they said that he had a knife. So we came

to him and we asked him did you have a knife and he went in his pocket and it looked like a knuckle puncher, like a brass whatever and he pulled it out and he said I didn't strike anybody with it of course. And he said this is just to defend myself from people attacking me because he has a lot of merchandise on him."

We agree with Jermaine that, as a technical matter, Vaughn's testimony that Floyd said that he did not strike anyone with the knife and that he carried it solely for defensive purposes was improper. It was obviously nonresponsive to the question asked, and it was also on its face inadmissible hearsay. But it does not follow that the court clearly and obviously erred. The State's question was not objectionable. The way to challenge this testimony would have been to move to strike it, which counsel did not do. The only error might be that the court failed to strike the nonresponsive hearsay *sua sponte*. See *People v. Sparkman*, 68 Ill. App. 3d 865, 870-71 (1979) (analyzing whether trial court plainly erred by not striking witness's nonresponsive answer that included improper opinion).

¶ 43 Viewed that way, we are not persuaded that the court clearly and obviously erred. Whether to raise and sustain an objection to Vaughn's nonresponsive hearsay testimony was a decision committed to the trial court's wide discretion. See *People v. Moore*, 2023 IL App (1st) 211421, ¶ 115. Reviewing courts review such decisions only for an abuse of that discretion. *Id.* ¶ 92. Advocates often make tactical choices not to object to something objectionable, and, "absent exceptional and compelling circumstances," trial judges respect counsel's decision not to highlight potentially damaging testimony that is technically improper. See *People v. Owens*, 372 Ill. App. 3d 616, 625 (2007). We are not persuaded that the court's decision not to intervene on its own motion was arbitrary, fanciful, or unreasonable, so it did not clearly or obviously abuse its discretion. See *Moore*, 2023 IL App (1st) 211421, ¶ 92.

¶ 44 For essentially the same reason, we hold that Jermaine has not demonstrated that counsel's failure to move to strike amounted to ineffective assistance. That decision may have been a tactical one, and, on this record, we cannot say that it would be objectively unreasonable to decide the benefits of objecting in these circumstances were outweighed by the risks. See *People v. Mays*,

2023 IL App (4th) 210612, ¶ 117 (noting that strategic decisions must be objectively unreasonable to support a claim of ineffective assistance).

¶ 45    As for the body-worn camera footage, the record does not support Jermaine's argument that the jury heard Floyd's prior consistent statements. Although the body-worn camera footage was published, the record indicates that it was played for the jury without sound. The record therefore does not sustain this claim of plain error or the related claim of ineffective assistance. See *People v. Adams*, 2024 IL App (1st) 221474, ¶ 36 (stating that appellants have the burden of affirmatively establishing error).

¶ 46                               III.  CONCLUSION

¶ 47    For the foregoing reasons, we hold that the evidence was sufficient to sustain Jermaine's conviction and that the record establishes neither plain error nor ineffective assistance of counsel. We therefore affirm his conviction.

¶ 48    Affirmed.